# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**VERONICA DAVIDSON,**

               **Plaintiff,**

**-vs-**                                       **Case No.  6:05-cv-1401-Orl-JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

               **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Veronica Davidson ["Davidson"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits. *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On October 16, 2000, Davidson protectively[1] filed a claim for disability insurance benefits, claiming disability as of August 20, 2000 due to a history cervical cancer, nerve damage from radiation treatment, chronic lumbar strain, pain, and depression.  R. 49-50, 99.  Davidson is insured for disability benefits through December 31, 2005.  R. 451.  Her claim was denied initially and upon reconsideration.  R. 39, 43.  On July 8, 2002, the Honorable Henry U. Snavely, Administrative Law Judge ["ALJ Snavely"], held a thirty-five-minute hearing on Davidson's claim in Daytona Beach,

---

[1]Davidson previously filed a claim for disability insurance benefits on January 27, 1998, claiming disability as of October 1, 1996.  R. 52-54.  The Commissioner denied that claim on March 19, 1998.  R. 45.

Florida.  R. 349-78.  Attorney Richard A. Schwartz represented Davidson at the hearing.  R. 349.

Judge Snavely heard testimony from Davidson and Shirley Seymour, Davidson's mother.  R. 350, 374.

On August 9, 2002, Judge Snavely issued a decision that Davidson was not disabled and not

entitled to benefits.  R. 17-23.  Following a review of the medical and other record evidence, Judge

Snavely found that Davidson could not perform her past relevant work as a maid, and a as a

"cook/dishwasher/resident aide."  R. 17, 22, Finding 8.  The ALJ found that Davidson nevertheless

retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional

requirements of sedentary work.  R. 22-23, Findings 7; 12.  Applying the Medical-Vocational

Guidelines, the ALJ concluded that Davidson was not disabled.  R. 23, Findings 13, 14.

After considering the contentions of Davidson's counsel in a memorandum submitted to the

Appeals Council on August 26, 2002, R. 341-42, the Appeals Council denied review on November

22, 2002.  R. 9-11.  In a letter to Davidson, the Appeals Council stated "[s]pecifically, the Appeals

Council considered the final regulations effective February 19, 2002, implementing the new listings

for muskuloskeletal (and related) impairments" and that "[t]he new regulations do not provide a basis

to change the [ALJ's] decision."  R. 9.

On November 14, 2002, Davidson's counsel submitted another letter and additional records

(covering August 8, 2002) to the Appeals Council.  R. 341-47.  On April 3, 2003, the Appeals

Council, after considering the additional evidence, set aside its earlier action denying the request for

review, reconsidered Judge Snavely's decision, and again denied Davidson's request for review.  R.

4-8.  The Appeals Council found that the additional evidence did not provide a basis for changing

Judge Snavely's decision.  R. 5.

Davidson appealed the Appeals Council decision to deny review to the district court on January 24, 2003. *See Davidson v. Commissioner of Social Security*, 6:03-cv-101-Orl-KRS, Docket No. 1(complaint). On April 2, 2004, the Honorable Karla A. Spaulding reversed and remanded the case pursuant to sentence four of 42 U.S.C. 405 (g). R. 419-26; *see also* Case No. 6:03-cv-101-Orl-KRS, Docket No. 21. Judge Spaulding found that the ALJ had failed to properly evaluate Davidson's complaints of pain and other subjective symptoms. R. 423-25. Judge Spaulding found that: 1.) the medical evidence showed that Davidson suffered from radiation necrosis and radiation neuropathy, but failed to discuss whether Davidson's pain was attributable to these medical conditions; 2.) the ALJ improperly discounted Davidson's pain testimony using activities of daily living that did not "support a finding that Davidson could be gainfully employed and perform the full range of sedentary work"; and 3.) the ALJ rejected the assessment by a treating physician, Dr. van Diepen, for "lack of supporting evidence," but failed to specify what he found "insufficient about the underlying record." R. 424-26.

Judge Spaulding concluded that substantial evidence did not support the ALJ's assessment of Davidson's credibility and the functional limitations arising from Davidson's subjective complaints. R. 425-26. Judge Spaulding further stated:

> On remand, the [Commissioner] may wish to obtain additional information about the symptoms arising from radiation necrosis and radiation neuropathy. After properly assessing Davidson's [RFC], including the nonexertional limitations arising from pain and side effects of medication, the better practice would be to call upon a vocational expert to assist in determining whether there is available work that Davidson can perform.

R. 426. The Clerk entered judgment on the same day reversing and remanding the case to the Commissioner. R. 418.

On May 13, 2004, the Appeals Council vacated "the final decision of the Commissioner," and remanded the case to the ALJ "for further proceedings consistent with [Judge Spaulding's] order." R. 430.  On December 7, 2004, the Honorable Gerald F. Murray, Administrative Law Judge ["ALJ"], held a thirty-minute hearing on Davidson's claim in Daytona Beach, Florida.  R. 392-417.  Attorney Schwartz again represented Davidson at the hearing.  R. 392.  The ALJ heard testimony from Davidson and Donna P. Mancini, an impartial vocational expert ["VE"].  R. 393.

On May 6, 2005, the ALJ issued a decision that Davidson was not disabled and not entitled to benefits.  R. 382-91.  Following a review of the medical and other record evidence, the ALJ found that Davidson could not perform her past relevant work as a maid and a "cook/dishwasher/resident aide."  R. 383, 390, Finding 7.  The ALJ found that Davidson nevertheless retained a RFC to perform a range of the physical exertional requirements of light and sedentary work "with no intensive or prolonged walking."  R. 388, 390, Finding 6.  In addition, the ALJ found that Davidson could sit and perform "simple unskilled work activity without limitation."  *Id.*  After hearing testimony from the VE and using the Medical-Vocational Guidelines as a "framework for decision-making," the ALJ concluded that Davidson was not disabled.  R. 390, Findings 12, 13.

On September 22, 2005, Davidson timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1 (complaint).[2]  On April 28, 2006, Davidson filed in this Court a memorandum of law in support of her appeal.  Docket No. 16.  On June 27, 2006, the

---

[2]According to 20 C.F.R. § 416.1484, the ALJ's decision after remand by a federal district court becomes the "final decision of the Commissioner" unless the Appeals Council assumes jurisdiction of the case.  20 C.F.R. § 416.1484(a).

Commissioner filed a memorandum in support of her decision that Davidson was not disabled. Docket No. 18.  The appeal is ripe for determination.

## II.   **THE PARTIES' POSITIONS**

Davidson assigns one main error to the Commissioner — that the Commissioner's decision was not based on substantial evidence — but argues four specific issues.  First, Davidson claims that the Commissioner failed to meet her burden of proving that Davidson could perform other work in the national economy.  Docket No. 16 at 13-14.  More specifically, Davidson argues that the Commissioner did not pose an accurate hypothetical to the vocational expert.  *Id.* at 14-15.  Second, Davidson claims that the Commissioner improperly rejected the opinions of Dr. van Diepen, Davidson's treating physician.  *Id.* at 15.  Third, Davidson argues that the Commissioner failed to develop a full and fair record, and should have obtained either a consultative examination or another RFC assessment from one of Davidson's treating physicians.  *Id.*  Fourth, Davidson argues that the Commissioner failed to properly evaluate Davidson's testimony on her pain and other subjective complaints.  *Id.* at 16-18.

The Commissioner argues that substantial evidence supports her decision to deny disability, and that the ALJ properly evaluated all of the medical evidence and testimony.  *See* Docket No. 18 at 4.  More specifically,[3] the Commissioner argues that the ALJ's hypothetical question to the VE accurately captured Davidson's RFC.  *Id.* at 11-12.  Second, the Commissioner argues that the ALJ properly accorded "limited probative weight" to Dr. van Diepen's assessment.  *Id.* at 7-8.  Third, the

---

[3]As discussed above, in her memorandum, Davidson stated one main issue on appeal, and argued four specific issues.  *See* Docket No. 16 at 1.  In her memorandum in opposition, the Commissioner responds to each of the four issues, but argues the four issues in a different order.  The Court addresses each issue in the order Davidson presented them in her memorandum.

Commissioner argues Davidson had the burden of producing an assessment from her treating physician, and that the ALJ was not required to order a consultative examination. *Id.* at 9-10. Fourth, the Commissioner argues that the ALJ provided "adequate reasons" for rejecting Davidson's testimony. *Id.* at 12-13.

## III.   **THE STANDARD OF REVIEW**

### A.   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

-6-

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).   A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the

district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[4]  *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the

---

[4]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.      DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.      THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does

-10-

not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the

-11-

claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the

national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th

Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's

impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing

court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.     PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### F.     CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th

Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See*

*Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054

(11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon*

*v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

        A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352

(11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the

implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d

at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit

finding as to credibility is required, the implication must be obvious to the reviewing court).

        G.      **MEDICAL TESTS AND EXAMINATIONS**

        The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine whether

the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th

Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a

consultative examination unless the record establishes that such an examination is necessary to enable

the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988);

*Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).   Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to

resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not

-20-

adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

## V.      **APPLICATION AND ANALYSIS**

### A.      **THE FACTS**

Davidson was born on May 20, 1966, and was thirty-eight years old on the date of the ALJ's decision to deny benefits. R. 52, 395. She attended school through the eighth grade, and has past work experience as a maid, dishwasher, resident assistant in an assisted living facility, and a cook. R. 84, 395. Davidson reported earnings through 2000, and is insured for disability benefits through December 31, 2005. R. 451-52. Davidson claims disability as of August 20, 2000 due to a history of cervical cancer, nerve damage due to radiation treatment, chronic lumbar strain, pain, and depression. R. 49-50, 99.

On October 2, 1996, Davidson went to the Halifax Medical Center emergency room with complaints of abdominal pain. R. 293-96. An ultrasound of her pelvis revealed an uterine mass. R. 294. Davidson underwent more tests. R. 293-96. On October 22, 1996, Davidson visited Neil Finkler, M.D. due to an abnormal pap-smear. R. 209. Dr. Finkler diagnosed cervical cancer. R. 210. The doctor recommended a biopsy, and discussed radiation therapy and chemotherapy. *Id.* Davidson decided to undergo a combination of therapies as soon as possible. *Id.*

Davidson underwent weekly radiation therapy and chemotherapy from October through December 1996. R. 191, 193, 198-99. Davidson visited Dr. Finkler for follow-up examinations during this time. On November 5, 1996, she complained to Dr. Finkler of "persistent" back pain. R. 197. The doctor changed her medication from Lortab to Demerol (taken every three to four hours) for her pain. R. 198. On December 3, 1996, Davidson complained of right leg discomfort and right hip pain. R. 195. On January 14, 1997, Davidson reported to Dr. Finkler that she had completed her

-22-

radiation therapy and chemotherapy.  R. 191.  The doctor's impression was that there was "no evidence of disease at completion of therapy."  R. 192.  Dr. Finkler prescribed estrogen for Davidson's hot flashes associated with her radiation therapy.  *Id.*

On February 25, 1997, Davdison returned to Dr. Finkler with complaints of right mid-abdominal pain radiating into her mid-flank.  R. 189.  She also complained of pain in her right leg (particularly in the middle inner thigh on the right side).  *Id.*  Dr. Finkler saw no evidence of disease, but recommended a CT scan of the abdomen and pelvis.  R. 189-90.

On June 6, 1997, Davidson returned to Dr. Finkler, and  complained of "worsening discharge as well as increasing pain, most notably in the vagina."  R. 186.  A pelvic examination was unremarkable "with the exception of necrosis"[5] at the apex of the vagina.  R. 187.  Dr. Finkler diagnosed: "Clinical Stage IIB carcinoma of the cervix, suspicious for recurrent disease."  *Id.*  The doctor recommended a biopsy to determine whether Davidson had radiation necrosis or a recurrent tumor.  *Id.*

On June 9, 1997, Davidson underwent CT scan of the pelvis, which showed a large cervical mass of mixed density.  R. 184.  The CT scan also revealed a mildly enlarged uterus which appeared to contain some fluid on the cavity, "probably due to cervical stenosis."[6]  *Id.*  On June 13, 1997, a cervix and vaginal biopsy showed inflammation, fibrosis, and necrosis, but was negative for malignancy.  R. 181.  The pathologist stated that the changes observed in the biopsy "could be related to radiation effect."  *Id.*  A Cytology Report dated June 17, 1997 from the Florida Hospital shows that

---

[5]"Necrosis"is the "[p]athologic death of one or more cells, or a portion of tissue or organ, resulting from irreversible damage . . ."  STEDMAN'S MEDICAL DICTIONARY 1179 (26th ed. 1995) ["STEDMAN'S"].

[6]"Stenosis" is the "stricture of any canal . . ."  STEDMAN'S at 1673.

Davidson had a normal pap smear generally. R. 188. The results showed a large amount of blood and heavy bacteria, but the diagnosis was "negative, within normal limits." *Id.*

On June 20, 1997, Davidson saw Dr. Finkler for a follow-up appointment after her biopsy. R. 179. Dr. Finkler noted that the biopsy revealed no evidence of cancer, and his impression was presumed radiation necrosis of the vaginal apex. R. 180. Dr. Finkler recommended Flagyl, half-strength Betadine douche, and Percocet, and stated that "[i]f this is in fact [sic] all radiation necrosis related, this should improve with the [prescribed] therapies." *Id.* Dr. Finkler expressed some concern about Davidson's marked necrosis extending both to the base of the bladder and the anterior cervix of the rectum, and stated that he needed to follow-up with Davidson on this issue in the next three weeks. *Id.*

On June 27, 1997, Davidson visited Dr. Finkler again. R. 178. Dr. Finkler's impression was radiation necrosis of the vaginal vault. R. 178. He recommended that Davidson continue with the Flagyl and douches. *Id.* On July 18, 1997, Davidson returned, and reported a marked decrease in the amount of discharge. R. 177. Davidson, however, continued to complain of pain, particularly in her back and left lower quadrant. *Id.* Dr. Finker diagnosed radiation necrosis, and told Davidson to continue the using the half-strength Betadine douches. *Id.* Davidson saw Dr. Finkler again on August 12, 1997. R. 176. Davidson reported taking Advil. *Id.* Dr. Finkler again diagnosed radiation necrosis. *Id.* He recommended that Davidson return in two weeks if she had not improved. *Id.*

On September 4, 1997, Davidson underwent vaginal biopsies and a tricut parametrial biopsy at the Florida Hospital due to her persistent complaints. R. 170-75. The procedures showed radiation necrosis. *Id.* Davidson visited Dr. Finkler on September 23, 1997 for a follow-up after the biopsies.

R. 168.   Dr. Finkler's impression was radiation necrosis, and he recommended that Davidson "continue with local care only and . . . return in one month." *Id.*  On October 21, 1997, Davidson complained to Dr. Finkler of increasing discharge and right lower quadrant pain. R. 165.  The doctor's impression was "[m]ultiple biopsies all still showing radiation necrosis." *Id.*  He recommended Flagyl and half-strength Betadine douches.  R. 166.

On November 19, 1997, Davidson visited Dr. Finkler with complaints of increased pain related to her radiation necrosis.  R. 151.  Dr. Finkler noted, on pelvic examination, that her vulva and vagina showed "some mild improvement in the radiation necrosis." *Id.*  Dr. Finkler's impression was that there was "[n]o clinical evidence of recurrent disease with multiple biopsies," but the doctor recommended that Davidson should undergo hyperbaric oxygen treatment for her radiation necrosis, given her continued complaints.  R. 151-52.  Dr. Finkler refilled her prescription for Lorcet, and contacted another doctor about the availability of hyperbaric oxygen treatment for that day.  R. 152.  On the same day, Davidson was admitted to Florida Hospital for hyperbaric oxygen treatment.  R. 174-49.  She received the treatment, and her pain "greatly improved while in the hospital."  R. 147.  Davidson was discharged on November 23, 1997.  The hospital doctors recommended Flagyl, continued hyperbaric oxygen therapy, MS Contin, and Habitrol (to quit smoking). *Id.*

On February 6, 1998, Dr. Finkler saw Davidson for a follow-up visit. R. 162.  She complained of increasing abdominal cramping. *Id.*  Dr. Finkler noted that a CT scan showed an enlarged uterus with areas of mixed density within the center of the uterus, suggesting obstruction. *Id.*  A review of her systems was remarkable for abnormal bleeding, nausea, and back pain. *Id.*  A pelvic examination revealed marked induration of the apex of the vagina.  R. 163.  Dr. Finkler recommended ultrasound

guidance. *Id.* She underwent dilation and curettage[7] under ultrasound guidance on February 18, 1998. R. 252-53.

On March 13, 1998, a non-examining state agency physician completed an assessment of Davidson's RFC. R. 215-22. The physician opined that Davidson could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit for approximately six hours in an eight-hour workday; and push and/or pull without limitation. R. 216. Davidson had no postural, manipulative, visual, communicative, or environmental limitations. R. 217-19.

Davidson saw William Mayfield, M.D., at the Halifax Medical Center on September 10, 1998 with complaints of right flank and lower extremity pain. R. 224-26. She described her pain as "aching," and stated that she had pain mainly around the kidney area into the right abdomen. R. 224. Davidson reported that her pain was "completely relieved" after taking Lorcet, and that the Lorcet was effective for three to six hours. *Id.* She reported taking four to five Lorcet each day, and complained that her pain increased with activity or prolonged sitting. *Id.* Dr. Mayfield's impression was right flank pain and anterior thigh pain in the distribution of the lateral femoral cutaneous nerve (possible etiology being post-radiation neuropathy). R. 225. He recommended Lorcet at a moderate dose since it "seems to be providing significant relief." R. 226.

On April 30, 1999, Davidson saw Dr. Finkler with complaints of bleeding, although she was not bleeding that day. R. 245. The doctor's impression was "no evidence of disease." R. 244. He recommended a follow-up appointment in four months, and told Davidson to visit him when she was bleeding. *Id.*

---

[7]Curretage involves scraping the interior of a cavity or tract to remove new growths or other tissues, or to obtain material for tissue diagnosis. STEDMAN'S at421.

On November 16, 1999, Davidson returned to Dr. Finkler for a follow-up examination.  R. 238.  She complained of bleeding and continued pain.  *Id.*  The physical examination was normal, and her vulva and vagina were "unremarkable."  R. 238-39.  The doctor's impression was "Known Stage II B carcinoma of the cervix with no evidence of disease, but persistent pain, postmenopausal bleeding, as well as persistent abdominal cramping."  R. 239.  Dr. Finkler recommended that she undergo cervical dilation ("to see whether or not [it] will help her"), hormonal therapy, and noted that Davidson was considering a hysterectomy.  R. 239.

On November 18, 1999, Davidson returned to Dr. Finkler with continued complaints of bleeding and pain.  R. 234-35.  Dr. Finkler recommended cervical dilation, which was performed the same day.  R. 236- 37.  The findings showed a "markedly stenotic" cervix, but the evaluation was "unremarkable."  R. 236.

Davidson returned to Dr. Finkler for a follow-up appointment on December 7, 1999.  R. 232-33.  The doctor's impression was atrophic endometrium.[8]  *Id.*  Dr. Finkler stated that "[a]t this point no further therapy is indicated.  I will see [Davidson] back in four months.  Obviously if she has any increase in her pain, then she needs to let me know[ ]."  R. 233.

On March 3, 2000, Davidson saw Dr. Mayfield again.  R. 223.  The doctor noted that he had been treating Davidson with oxycodone and Neurontin.  *Id.*  Davidson told Dr. Mayfield that Neurontin "works better than anything else that she has ever tried for this pain."  *Id.*  She reported sleeping through the night and not being awaked by the pain.  *Id.*  The doctor assessed probable right

---

[8]The endometrium is the mucous membrane comprising of the inner layer of the uterine wall.  STEDMAN'S at 570.

-27-

T12 intercostal neuralgia.  He also recommended that she continue taking Neurontin (but possibly increasing the dosage), and told Davidson to consider injection therapy for her pain.  *Id.*

Dr. Finkler saw Davidson on June 20, 2000.  R. 229-30.  Davidson complained of pain, particularly in her left lower quadrant, but denied having vaginal discharge or bleeding. R. 229.  Her physical examination was mainly normal, and Dr. Finkler's impression was pelvic pain, which was probably "related to radiation fibrosis, sclerosis."[9]  *Id.*  Dr. Finkler stated "[a]t this point, she needs to be seen by pain management as they need to clearly come up with a plan of management in control of her pain.  There is certainly no evidence of any recurrent disease . . ."  R. 230.

Before August 2000, Davidson was working at various full-time jobs.  R. 396.  Davidson stopped working as a cook on August 20, 2000, although she did "some" babysitting for a few months after August 2000.  R. 99, 396.  Davidson claims disability as of August 20, 2000.  R. 49-50, 99.

On October 3, 2000, Davidson returned to Dr. Finkler for a follow-up examination, and complained of continued pain that mostly occurred during intercourse.  R. 311.  During the doctor's review of systems, Davidson denied having any "psychiatric illness," depression, or "general extremity weakness."  *Id.*  She further denied experiencing any vaginal discharge or bleeding.  *Id.*  Dr. Finkler's impression was "Known II B carcinoma of the cervix with vaginal vault necrosis with worsening pain."  R. 312.  He recommended that Davidson undergo a CT of the abdomen and pelvis, a test for her SCC antigen levels, and a PET scan (if the CT was negative) to confirm the lack of recurrent disease.  *Id.*  On October 6, 2000, Davidson underwent CT scans of the abdomen and pelvis.  Both CT

---

[9]"Fibrosis" is the formation of fibrous tissue as a "reparative or reactive process, as opposed to formation of fibrous tissues as a normal constituent of an organ or tissue.  STEDMAN'S at 650.  "Sclerosis" is defined as "induration," or the "process of becoming extremely firm or hard."  *Id.* at 867 (definition of "induration"), 1583 (definition of "sclerosis").

scans revealed "stable" results.  R. 227-28.  The scan of the pelvis did not reveal any changes from her prior CT scan.  R. 228.

On November 1, 2000, Davidson saw Gail van Diepen, D.O., for a second opinion about her complaints.  R. 270.  Davidson complained of abdominal bleeding and pain.  Dr. van Diepen diagnosed stage IIB cervical cancer (status post chemotherapy and radiation therapy) and persistent vaginal pain and bleeding.  *Id.*  The doctor referred to Davidson to Shands Teaching Hospital Clinics ["Shands"] for an opinion on surgery.  *Id.*

On November 6, 2000, Linda S. Morgan, M.D., the Director of GYN Oncology at Shands, saw Davidson.  R. 256-60.  Davidson complained of chronic back pain, worsening pelvic pain, and dyspareunia.[10]  R. 256.  The doctor conducted a physical examination and review of Davidson's history and CT scans.  *Id.*  Her physical examination revealed mainly normal results, with the exception of induration and atrophy upon vaginal and rectovaginal examination.  R. 258-59.  Davidson's extremities were "without edema," and she had no focal neurological deficiencies.  R. 259.  The doctor assessed Stage II B squamous cell carcinoma of the cervix, status post radiation therapy and chemotherapy.  *Id.*  Dr. Morgan further stated that there was no evidence of disease, and that Davidson was not "a surgical candidate due to her prior therapy."  *Id.*  The doctor recommended that Davidson enroll in a pain management and behavior modification therapy program, and that she use lubricants to help her dysparuenia.  *Id.*

On December 11, 2000, another non-examining state agency physician assessed Davidson's physical RFC.  R. 260-67.  The physician opined that Davidson could lift and/or carry twenty pounds

---

[10]Dyspareunia is the "[o]ccurrence of pain during sexual intercourse."  STEDMAN'S at 1673.

-29-

occasionally and ten pounds frequently; stand, walk, and/or sit for six hours in an eight-hour workday; and push and pull without limitation.  R. 261.  She could frequently climb, balance, kneel, and crawl; and could occasionally stoop and crouch.  R. 262.  She had no manipulative, visual, communicative, or environmental limitations.  R. 263-64.

Davidson returned to Dr. van Diepen on March 20, 2001 with complaints of insomnia, low back, abdominal, right hip, and right lower extremity pain.  R. 268.  Dr. van Diepen assessed lumbar spine pain and pain in the hips, and prescribed medication, including Ambien (for insomnia) and Duragesic patches (for the pain).  *Id.*  Dr. van Diepen also ordered a body scan to evaluate Davidson's lumbar pain, which was performed on April 18, 2001.  R. 335.  The whole body bone scan was "unremarkable" and showed no significant changes from a prior scan in February 1998.  *Id.*

On April 21, 2001, a non-examining state agency clinical psychologist completed a Psychiatric Review Technique form.  R. 271-84.  The psychologist opined that Davidson had no medically determinable mental impairment.  R. 271.

On May 3, 2001, a third non-examining state agency physician opined as to Davidson's physical RFC.  R. 285-92.  This physician opined that Davidson could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit for six hours in an eight-hour workday; and push and pull without limitation.  R. 286.  She could frequently climb, kneel, and crawl; and could occasionally balance, stoop, and crouch.  R. 287.  She further had no manipulative, visual, or communicative, limitations.  R. 288-89.  Davidson had no environmental limitations, except that she had to avoid concentrated exposure to hazards.  R. 289.

Dr. van Diepen saw Davidson for a follow-up appointment on June 19, 2001.  R. 327.

Davidson complained of right hip and right leg pain, hot flashes, and being unable to walk at times.

*Id.*  Upon physical examination, the doctor noted Davidson had a "rocking gait," right hip pain, and

that Davidson was "[r]ocking back [and] forth" because of pain in her hip and lumbar spine.  *Id.*  The

doctor's assessment was status-post cervical cancer and chronic vaginal, right hip, and lumbar spine

pain.  *Id.*  Dr. van Diepen recommended medications (including Zyban and Vioxx), and told Davidson

that she "must quit smoking."  *Id.*

On June 21, 2001, Dr. van Diepen completed a "Medical Assessment of Ability to Do Work

Related Activities (Physical)" form, in which she opined that Davidson could lift less than five pounds

occasionally; carry less than fifteen pounds occasionally; sit for thirty minutes at one time for a total

of three hours in an eight-hour workday; and stand fifteen minutes at a time each hour in an eight-hour

workday.  R. 325.  The doctor stated that Davidson could walk for one block and then "must stop,"

and noted that Davidson walked her dogs a one half to one block three to four times per day.   R. 326.

Dr. van Diepen further opined that Davidson was "normal" in her ability to handle objects, and was

"OK" in bending.  *Id.*  Under the category for "Pushing and/or Pulling," the doctor wrote: "No.

Cannot sweep, mop, or vacuum."  *Id.*  The prognosis for Davidson was "fair."  *Id.*

Davidson returned to Dr. van Diepen on July 9, 2001.  R. 323.  Under "chief complaint, Dr.

van Diepen listed "Disability Letter;" a tick bite left side; and fever, chills, sweating, and "feels very

sick."  *Id.*  She also told the doctor that she felt that she needed a cane.  *Id.*  The doctor assessed status-

post cervical cancer and a urinary tract infection.  *Id.*  On August 7, 2001, Davidson returned to Dr.

van Diepen.  R. 320.  She complained of ear and knee pain.  R. 320.  She stated that she had no injury

-31-

to the knee, but her left knee pain increased with movement.   *Id.*   The doctor noted pain at full extension, but no tenderness, swelling, deformity, or crepitus, in the left knee.   *Id.*   The doctor's impression was patellar knee pain with possible bursitis.   *Id.*   The doctor prescribed Vioxx and other medications.   *id.*

On October 25, 2001, Davidson went to Dr. van Diepen with complaints of bilateral pain in her hands, stating that her hands "ache . . .[and] burn all the time."   R. 219.   She further complained of having increased mood swings and depression.   *Id.*   Dr. van Diepen assessed palm and ear pain, chronic pain, and "depression/mood swings."   *Id.*   The doctor Effexor (for depression), Vioxx, and urged Davidson to quit smoking.   *Id.*

On February 4, 2002, Dr. van Diepen completed another "Medical Assessment of Ability to Do Work Related Activities (Physical)."   R. 314-15.   The doctor opined that Davidson could lift five to ten pounds occasionally; sit for thirty minutes at one time for a total of three hours in an eight-hour workday; and stand for one to two hours at one time for a total of four to six hours in an eight-hour workday.   R. 314.   Davidson was further unable to carry, but was able to "do repititious handling."   R. 314-15.   Under the category for "Walking," the doctor wrote that Davidson was "unable to get [sic] 1 block [because of] severe pain [in her right] side."   R. 315.   Under "Bending," the doctor stated that Davidson was "unable to bend, 1/3 bending is all [Davidson] is able to bend."   *Id.*   Under "Pushing and/or Pulling," Dr. van Diepen stated that Davidson was "unable –   pain [increases] – washing dishes, moping [sic], sweeping."   *Id.*   The prognosis was "poor for improvement."   *Id.*

Davidson visited Dr. van Diepen on May 16, 2002, and complained of hair loss, pain in the right side, insomnia, and being unable to walk.   R. 313.   She also stated that her hormone medications

were not working.  *Id.*  The doctor diagnosed persibent pain in the vaginal region, hair loss, insomnia, and hot flashes.  *Id.*  The doctor increased her dosage of Duragesic medication.  *Id.*

Davidson underwent a CT scan of her pelvis on June 14, 2002.  R. 328.  The scan revealed "slight haziness to the paracervical fat plane which was not clearly seen perviously."  *Id.*  The impression was: "Inhomogeneous enhancement of the uterus with some fluid within the uterine cavity.  The possibility of fibroids and/or underlying malignancy should be entertained."  *Id.*

On July 16, 2002, Davidson visited Dr. Finkler with complaints of increasing pain.  R. 339.  The doctor noted that Davidson's recent Pap smear showed anucleated cells.  *Id.*  During the review of systems, Davidson denied having depression or any psychiatric illness.  *Id.*  Her physical examination was mostly normal; Dr. Finkler noted that her vulva and vagina were "unremarkable."  R. 340.  The impression was "probable hematopyometria[11] secondary to cervical stenosis post radiation therapy, doubt recurrence."  *Id.*  The doctor recommended a cervical biopsy to rule out recurrent disease and cervical dilation under ultrasound guidance.  *Id.*

Davidson returned to Dr. Finkler on August 8, 2002.  R. 346-47.  She complained of pain, and again, denied menstrual irregularities, depression, or any psychiatric illness.  R. 346.  Her physical examination was mostly normal, and the diagnosis was "probable hematopyometria secondary to cervical stenosis post radiation therapy."  R. 347.  Dr. Finkler again recommended a cervical biopsy to rule out recurrent disease and cervical dilation under ultrasound guidance.  *Id.*

On August 8, 2002, Davidson visited Florida Hospital Medical Center, and underwent cervical dilation with drainage of hematometra and cervical biopsies.  R. 521-22.  The examination was

---

[11]"Hermatometra" is a collection or retention of blood in the uterine cavity.  STEDMAN'S at 421.

unremarkable with the exception of a cervical flush at the apex of the vagina "post radiation." R. 522. Davidson visited Dr. van Diepen on August 22, 2002. R. 543. She reported improvement in her hot flashes, but complained that she was still losing hair. *Id.* She also reported taking Zoloft, but being "very depressed" and crying. *Id.* The impression was cervical cancer and "depression/anxiety." *Id.* Dr. van Diepen recommended increasing her dosage of Zoloft, and told Davidson to follow-up with Dr. Finkler. *Id.*

On November 26, 2002, Davidson visited Dr. Finkler. R. 494-95. Davidson complained of increasing pelvic pain. R. 494. She denied depression or any psychiatric illness. *Id.* The physical examination was mainly normal. R. 494-95. Dr. Finkler's impression was recurrent hematometras, secondary to cervical stenosis. R. 495.

Dr. van Diepen examined Davidson on January 20, 2003. R. 540. Davidson complained of "severe" pain in her right hip which she stated worsened when walking, but improved with no weight bearing. *Id.* The doctor assessed hip pain, cervical cancer, and "depression/anxiety"; increased Davidson's dosage of MS Contin, Vioxx; and told Davidson to call if she had any problems. *Id.*

On January 21, 2003, Davidson visited Dr. Finkler. R. 492-93. She reported that she was on Depo-Provera (hormonal birth control), but stated that her pain and her hot flashes had not improved. R. 492. She denied depression and psychiatric illness. R. 492. Her physical examination was unremarkable. R. 493. Dr. Finkler diagnosed "Known recurrent hematometra." *Id.* He recommended three more months of Devo-Provera, and scheduled a follow-up appointment in three months. *Id.* He

noted that if she had not improved within three months, he had "no other alternative but to proceed with a [total abdominal hysterectomy with bilateral salpingo-oopherectomy]."[12]  *Id.*

A January 31, 2003 bone scan of Davidson's whole body revealed "no evidence of an abnormal uptake in [Davidson's] hips." R. 550.  The study was "unremarkable." *Id.*  A CT scan of her right hip was negative, showing "[n]o evidence of bony abnormality, either acute fracture or destructive change." R. 551.  The doctor compared the CT scan to an October 2000 CT scan, and found no evidence of changes. *Id.*

On April 25, 2003, Davidson returned to Dr. Finkler with continued complaints of hot flashes and pain. R. 490-91.  She denied depression and psychiatric illness, and her physical examination was unremarkable. *Id.*  Dr. Finkler diagnosed "Stage IIB carcinoma of the cervix with a prior history of vault necrosis[,] now with cervical stenosis and fluid-filled endometrial cavity with marked pain." R. 491.  Dr. Finkler told Davidson that she had two options – continue with their "current regimen" or proceed with a hysterectomy. *Id.*

On May 12, 2003, Davidson returned to Dr. Finkler with the same complains of pain and hot flashes. R. 487-88.  She denied depression and psychiatric illness, and her physical examination was unremarkable. *Id.*  She decided to undergo the hysterectomy and bilateral salpingo-oopherectomy. R. 488.  On May 12, 2003, Davidson was admitted to Florida Hospital, and underwent a hysterectomy and bilateral salpingo-oopherectomy. R. 466-77.  At the hospital after the procedure, Douglas A. Conigliaro, M.D., examined Davidson. R. 468-71.  Dr. Conigliaro noted that Davidson had some difficulty walking, and that she was wearing venous compression boots. R. 469-70.  She stated that

---

[12] A salpingo-oophorectomy is a removal of the ovary and its fallopian tubes.  STEDMAN'S at 1567.

she had mild depression and anxiety; that she was taking an antidepressant; but that had not seen a psychiatrist.  R. 469.  Dr. Conigliaro noted that she was "a candidate for the use of analgesics for the control of her chronic pain" and that "[a]t the present time, she does have acute pain superimposed and has had pain adequately addressed with the use of the [patient-controlled analgesia]."  R. 470. Davidson's "postoperative course was unremarkable," and she was discharged on May 14, 2003.  R. 466.

On May 20, 2003, Davidson returned to Dr. Finkler for a follow-up examination after her surgery.  R. 485-86.  The doctor noted that a final pathology report after the surgery was negative.  R. 485.  Davidson denied psychiatric illness or depression, and her physical examination was unremarkable.  R. 485-86.  Dr. Finkler stated that "[n]o further therapy is indicated," and that he would see Davidson for a follow-up appointment in six weeks.  R. 486.

On July 1, 2003, Davidson visited Dr. Finkler, and complained of right lower quadrant pain which radiated around her back.  R. 483-84.  She denied depression or psychiatric illness, and her physical examination was unremarkable.  *Id.*  The impression was a history of cervical cancer and status-post hysterectomy bilateral salpingo-oopherectomy.  R. 484.  The doctor recommended that Davidson undergo an ultrasound to check her right kidney, but stated that if the ultrasound was normal, "no further intervention is necessary."  *Id.*  He further noted that she would have pain "post radiation therapy from her IIB carcinoma of the cervix."  *Id.*  The doctor scheduled a follow-up appointment in one year.  *Id.*

On July 22, 2003, Davidson saw Dr. van Diepen, and reported swelling in her hands and feet. R. 536.  She stated that the swelling of her legs was worse in the afternoon.  *Id.*  Dr. van Diepen recommended X-rays of her hip and pelvis, and told Davidson to quit smoking.  *Id.*

A July 29, 2003 ultrasound of Davidson's kidney and bladder revealed that Davidson had a small right kidney with global cortical thinning which was "likely . . . secondary to prior insults from infection and/or reflux."  R. 509.  The ultrasound also showed a small echogenic focus identified in the mid to inferior right medial kidney, which the radiologist stated was "difficult to tell if this represents a small foci of fat or a nonshadowing calcification."  *Id.*  The radiologist recommended further evaluation with a CT scan of the abdomen.  *Id.*

Davidson underwent an ultrasound of her abdomen on August 11, 2003.  R. 507-08.  The impression was: 1.) intrahepatic and extrahepatic biliary ductal dilation, 2.) small right kidney with multiple areas of scar, and a tiny calcific density that "could represent a small dystrophic calcification or a small renal calculus, and 3.) "[p]ossible tiny left upper pole renal calculus vs. dystrophic calcification."  *Id.*  The left kidney was otherwise unremarkable.  R. 508.

On August 22, 2003, Davidson visited Dr. van Diepen with complaints of hip pain.  The assessment was questionable radiation related scarring causing hip pain.  R. 533.  Dr. van Diepen assessed questionable radiation-related scarring that was causing hip pain and chronic pain syndrome. *Id.*  The doctor recommended MS Contin, Lortab, and Vioxx.  *Id.*  The doctor further stated that Davidson "needs meds [sic] regularly to get pain under control."  *Id.*

On December 3, 2003, Davidson returned to Dr. van Diepen, and stated that her back pain and walking were "worse" and that her right leg "gives out."  R. 525.  The doctor assessed chronic lumbar

spine pain, right hip and leg pain, and a history of cervical cancer, and refilled all of Davidson's medications.  *Id.*  Davidson saw Dr. van Diepen again on January 6, 2004.  R. 531.  She complained of increased lumbar spine and hip pain.  *Id.*  The doctor assessed chronic lumbar spine pain, right hip pain, and a history of cervical cancer, and increased Davidson's dosage of MS Contin.  *Id.*

On March 4, 2004, Davidson visited Dr. van Diepen, and complained of pain in her lumbar spine, and occasionally feeling tired from her medications.  R. 530.  Davidson stated that Zoloft was "working for depression."  *Id.*  Dr. van Diepen's assessment was the same as the prior visit, and the doctor refilled Davidson's medications.  *Id.*  On March 15, 2004, Davidson returned to Dr. van Diepen with complains of severe flank pain and having a fever for two or three days.  R. 529.  The doctor prescribed medication and told Davidson to take more fluids.  *Id.*  Davidson underwent a CT scan of her lumbar spine on March 23, 2004.  R. 526-27.  The impression was "essentially negative examination of the lumbar spine."  R. 528.

Davidson saw Dr. van Diepen for a follow-up appointment on May 6, 2004.  R. 560.  Davidson reported that her back pain and walking were "worse."  *Id.*  The doctor refilled all of her medications. *Id.*  On July 1, 2004, Davidson complained a fever and chills, blood in her urine, and right back pain. Dr. van Diepen assessed a urinary tract infection and a history of cervical cancer, and prescribed medication.  *Id.*  On November 3, 2004, Davidson told Dr. van Diepen that her hair was falling out, and that the problem was getting worse.  R. 558.  Davidson also stated that her "pain is tolerable," but she also stated that she was unable to walk.  *Id.*  The doctor assessed a history of cervical cancer, right pelvic/flank pain, and chronic lumbar spine pain.  *Id.*  Dr. van Diepen prescribed medication.  *Id.*

At the request of the Office of Disability Determinations, J. Jeff Oatley, Ph.D. performed a psychological evaluation of Davidson on August 12, 2004.  R. 512-14.  Davidson reported suffering from chronic low back and hip pain, and stated that she had never received counseling from a mental health professional.  R. 512.  She reported receiving psychopharmcaological treatment from her primary health providers, and stated that the medications helped to "calm [her] and help [her] depression."  *Id.*  Dr. Oatley noted that Davidson's gait was balanced, and that her attention span and activity level were appropriate.  R. 213.  She completed the testing with only one "short" break.  *Id.*  The tests showed that Davidson was within "normal limits."  *Id.*  Dr. Oatley stated that she showed good concentration and energy level with "some somatic concerns and nervousness to these concerns."  *Id.*  He diagnosed a history of cervical cancer, pain disorder, and Dysthymic Disorder, DSM-IV 300.4[13] as indicated by a history of sadness that appeared to be responding well to antidepressants."  R. 513-14.  He stated that her prognosis was "fair," and that she appeared capable of managing finances.  R. 514.

Dr. Oatley also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental).  R. 215-16.  He opined that Davidson had "good" ability to follow work rules; relate to co-workers; "deal" with the public and work stress; use judgment; interact with supervisors; function independently; maintain attention or concentration; understand, remember, and carry-out complex,

---

[13] *See* The DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  The essential feature of Dysthmic Disorder is a "chronically depressed mood that occurs for most of the day more days than not for at least 2 years."  DSM-IV at 345.  The person may experience poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness.  *Id.* at 349.  During the two-year period of depressed mood, the person is never without the symptoms for more than two months at a time.  *Id.*

detailed, or simple job instructions; maintain her personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability.  *Id.*

On December 7, 2004, Davidson testified at the ALJ hearing.  R. 392-417.  At that time, she was using the Duragesic patches, Lortab, and MS Contin.  R. 397-98.  She stated that she takes the MS Contin twice a day, two to three days per week, depending on "how bad the pain is."  R. 398.  She testified that the MS Contin makes her drowsy and light-headed, and that after taking MS Contin, she has to sleep for four hours, and that this occurs two or three times a week.  R. 399.

Davidson testified that she has "[r]eally bad pain" in her right side.  *Id.*  She also testified that Zoloft helps her depression.  R. 403.  She testified that she had problems with her kidney, but was not receiving treatment.  R. 404.  She estimated that she could lift approximately ten pounds "on a good day" and five pounds "on a bad day."  R. 405.  She takes her chihuahua for walks, but she can only walk one block.  R. 405.  Davidson further described pain in her pelvis and back as a sharp pain sometimes.  R. 406.  Other than drowsiness, she experiences dry mouth and forgets "a lot of things" as a result of taking her medications.  *Id.*

She also testified that she cannot walk anymore due to the pain.  R. 407.  She can sit in a car for approximately twenty to thirty minutes, but then she has to get out of the car.  R. 408.  She also testified that she watches a lot of television, and that her dog and two cats keep her busy.  R. 409.  Davidson testified that she cannot work because she would not be able to lie down, take a warm shower, or use a heating pad to alleviate her pain, as she can while she is at home.  R. 414.  She stated that sleeping with a heating pad on her right side "seems to help."  *Id.*

### B.    THE ANALYSIS

Following a review of the medical and other record evidence, the ALJ found that Davidson could not perform her past relevant work as a maid and a "cook/dishwasher/resident aide."  R. 383, 390, Finding 7.  The ALJ found that Davidson nevertheless retained the RFC to perform a range of the physical exertional requirements of light and sedentary work "with no intensive or prolonged walking."  R. 388, 390, Finding 6.  In addition, the ALJ found that Davidson could sit and perform "simple unskilled work activity without limitation."  *Id.*

### 1.    VE Hypothetical

First, Davidson claims that the Commissioner erred by failed to meet her burden of proving that Davidson could perform other work in the national economy.  Docket No. 16 at 13-14.  Davidson argues that the Commissioner erred by failing to pose an accurate hypothetical to the vocational expert, and more specifically, that the ALJ should have included Davidson's pain and drowsiness as limitations.  *Id.* at 14-15.  The Commissioner argues the ALJ's hypothetical question to the VE accurately captured Davidson's RFC.  Docket No. 18 at 11-12.

Reliance on VE testimony is proper where the hypothetical questions posed by the ALJ accurately depict a claimant's impairments.  In this case, the ALJ correctly recognized that Davidson's non-exertional impairments precluded exclude the use of the grids to establish that Davidson could perform other work that exists in the national economy, and thus relied on VE testimony.  *See* R. 389.

During Davidson's hearing, the ALJ asked the VE a series of hypothetical questions in an effort to recite work restrictions similar to Davidson's.  The ALJ asked the VE to assume a person of similar age, education, and experience as Davidson who could only perform sedentary or light

unskilled work, but who could not walk "extensive[ly]."  R. 415-16.  The ALJ clarified: "In other words, if it's light [work], it's not light because of the walking requirement . . ."  R. 416.  The VE responded that the hypothetical individual would be able to work as a blood donor unit assistant (unskilled light work), a "deli cutter/slicer" (unskilled light work), a "counter-clerk/photo finishing" position (unskilled light work), a toll collector (unskilled light work).  *Id.*

The ALJ next posed to the VE to that if the same hypothetical individual would have to take "extended breaks beyond the 15 minutes [in the] morning and afternoon and the lunch hour to lay down, you're at difficult [sic] to find any suitable job."  R. 417.  The VE responded: "That's correct."  *Id.*

Remand on this issue is not necessary.  First, the ALJ took into account Davidson's pain and medication side effects by limiting her to sedentary or light work, and limiting the jobs to those that did not require walking.[14]  Next, substantial evidence supports the ALJ's hypothetical questions to the VE, as well as the ALJ's RFC finding.  Davidson complained of pain as early as 1996, but was able to work full-time until August 20, 2000.  Although Dr. Finkler recommended cervical dilations and

---

[14]20 C.F.R. § 404.1567 provides that "light work":

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).  The regulation further provides that "sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

the hysterectomy with bilateral salpingo-oopherectomy, he recommended *very* conservative treatment after the hysterectomy.  Dr. Finkler even stated that "[n]o further therapy is indicated" on May 2003.  R. 486.  In fact, his physical examinations were largely unremarkable after the hysterectomy.  *See, e.g.*, R. 483-86, 530.  Dr. Finkler scheduled a follow-up appointment for *one year* later after Davidson's visit on July 1, 2003, and Davidson submitted no record from Dr. Finkler after her July 1, 2003 visit.  R. 484.  Of the treating physicians, Dr. Finkler had the most extensive relationship with Davidson.  Nevertheless, he never stated work restrictions, and never opined as to Davidson's limitations.

Additionally, although Davidson testified to feeling drowsy from her medications at the ALJ hearing, Dr. van Diepen only once noted on March 4, 2004 that Davidson complained of "occasionally feeling tired" from her medications.  R. 530.  Dr. van Diepen stated rather severe restrictions in two Medical Assessment of Ability to Do Work-Related Activities (Physical) on June 21, 2001 and February 4, 2002.  R. 314-15, 325-26.  The ALJ, however, properly accorded the assessments "little probative weight" because they appeared to be based "primarily on [Davidson's] subjective complaints rather than upon objective medical findings"; and the doctor's treatment records "contain few objective medical findings related to the conditions upon which [Davidson] alleges disability."  R. 387.  The ALJ further noted that Dr. van Diepen's treatment notes reflected no "significant" findings, and that the doctor was a "Doctor of Osteopathy with no area of specialty."  R. 388.  The ALJ contrasted Dr. van Diepen with Dr. Finkler, a specialist in oncology and Dr. Mayfield, a pain management specialist — neither of whom stated any work-related restrictions.  *Id.*

The ALJ is correct.  In her treatment notes, Dr. van Diepen seemed to make diagnoses that endorsed all of Davidson's reported complaints.  Nevertheless, Dr. van Diepen treated Davidson

-43-

*extremely* conservatively — at most recommending either medication or further tests. *See, e.g.*, R. 533. Dr. van Diepen's assessments were both before Davidson's May 12, 2003 hysterectomy with bilateral salpingo-oopherectomy. R. 466-77. The assessments comprised vague, brief answers without further explanation or diagnoses. *See* R. 314-15, 325-26.

Substantial evidence supports the ALJ's description of Davidson's limitations – both in the hypothetical posed to the VE and in the ALJ's RFC Finding. The VE testified that Davidson could perform jobs existing in the national economy, and the Commissioner therefore met her burden. Remand is not required.

### 2.     Davidson's Treating Physician

Davidson claims that the Commissioner improperly rejected the opinions of Dr. van Diepen, Davidson's treating physician. Docket No. 16 at 15. The Commissioner argues that the ALJ properly accorded "limited probative weight" to Dr. van Diepen's assessment. Docket No. 18 at 7-8.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580.

As discussed above, the ALJ stated specific and adequate "good cause" for rejecting Dr. van Diepen's opinions. In addition, most of the objective tests were negative. Her April 18, 2001 whole body bone scan was "unremarkable, and the March 23, 2004 CT scan of her lumbar spine was negative. R. 335, 528. Her July and August  2003 CT scan and ultrasound did show changes in kidneys, R. 507-09, but as of December 2004, she had not received treatment for her kidney

"problem." R. 404. Thus, substantial evidence, including Dr. van Diepen's own treatment notes, does not support Dr. van Diepen's assessments. The ALJ properly rejected the treating physician's opinions, and stated "good cause" to do so.

3.     The ALJ's Duty to Develop the Record

Third, Davidson argues that the Commissioner failed to develop a full and fair record, and should have obtained either a consultative examination or an RFC assessment from one of Davidson's treating physicians. Docket No. 16 at 15. The Commissioner argues Davidson had the burden of producing an assessment from her treating physician, and that the ALJ was not required to order a consultative examination. Docket No. 18 at 9-10.

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917. In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay*, 848 F.2d at 1209.

Davidson specifically argues that since the ALJ made a comparison of the treating physicians' areas of specialty, and stated lack of expertise as a reason for rejecting Dr. van Diepen's assessments, the ALJ should have obtained an RFC assessment from either Dr. Finkler or Dr. Mayfield, or in the alternative, the ALJ should have ordered another consultative examination. Davidson's argument is without merit. Davidson did not submit records that support her contention that she is disabled. The ALJ had sufficient medical evidence, including *numerous* treating notes from Dr. Finkler, to determine

-45-

whether Davidson is disabled.  Dr. Finkler, in his recommendations to Davidson and in his treating notes, never stated restrictions on Davidson's abilities to work.  Substantial evidence supports the ALJ's determinations, and the ALJ was not required to order additional assessments and examinations.

4.   Davidson's Testimony

Fourth, Davidson argues that the Commissioner failed to properly evaluate Davidson's testimony about her pain and other subjective complaints.  Docket No. 16 at 16-18.  The Commissioner argues that the ALJ provided "adequate reasons" for rejecting Davidson's testimony. Docket No. 18 at 12-13.

The ALJ must evaluate a claimant's complains of pain using the Eleventh Circuit's three-part "pain standard." *Foote,* 67 F.3d at 1560.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).

In this case, the ALJ made specific findings as to the severity of the impairment giving rise to Davidson's complaints of pain.  The ALJ found Davidson's pain and nerve necrosis resulting from radiation treatment to be a "severe" impairment.  R. 390, Finding 3.  The ALJ further stated that:

> the evidence establishes existence of a severe impairment documented by objective medical findings that could reasonably produce the type of symptoms alleged by [Davidson].  However, the medical and other evidence does not support the disabling degree of pain and limitation as alleged by [Davidson].

-46-

R. 387.  The ALJ then explained why the "medical evidence does not indicate pain of the frequency or severity that would preclude [Davidson] from all gainful work activity."  *Id.*  Elsewhere in his decision, the ALJ stated that the evidence did "not show the existence of a medically determinable impairment(s) that could reasonably be expected to produce pain or other symptoms of the frequency or severity that would result in an inability to function effectively on a sustained basis."  R. 386.  The ALJ then summarized reasons (e.g., Davidson can ambulate independently, use her upper extremities, and bathe and dress herself) why Davidson had not lost her ability "to function effectively on a sustained basis."  *Id.*

The ALJ's conclusions on Davidson's complaints of pain and other subjective complaints are clear.  While the ALJ did not specifically cite the Eleventh Circuit pain standard, his findings are consistent with the standard.  R. 386-87.  The ALJ articulated specific and adequate reasons for discrediting Davidson's testimony about pain, *id.*, and substantial evidence supports his conclusions.  This Court will not disturb the ALJ's credibility finding.

## VI.   **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk should enter a judgment and close the case.

**DONE AND ORDERED** this 22nd day of March, 2007.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

-47-

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia         30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Gerald F. Murray
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817